IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| VANESSA L. NAISHA,<br><br>                    Plaintiff;<br><br>          v.<br><br>DANA METZGER, Warden of James T. Vaughn Correctional Center, KESHAW TRAVIES, Lieutenant at James T. Vaughn Correctional Center, and MICHAEL ARABIA, Correctional Officer at James T. Vaughn Correctional Center, individuals and in their official capacities.<br><br>                    Defendants. | Civil Action No. 18-738-RGA |

<u>MEMORANDUM OPINION</u>

Vanessa L. Naisha.

Pro se Plaintiff.

George, Thomas Lees, III, Deputy Attorney General, DEPARTMENT OF JUSTICE, Wilmington, DE.

Attorney for Defendants.

September 30, 2020

1

/s/ Richard G. Andrews
**ANDREWS, U.S. DISTRICT JUDGE:**

Before the Court is Defendants' Motion for Summary Judgment. (D.I. 74). Plaintiff has

submitted an Opposition to Defendants' motion (D.I. 86), and Defendants have replied (D.I. 88).

## I.      BACKGROUND

Plaintiff Vanessa L. Naisha is a transgender inmate, who identifies as a woman, at James

T. Vaughn Correctional Center (JTVCC) in Smyrna, Delaware. (D.I. 1 at 1). Plaintiff brought

suit under 42 U.S.C. § 1983, alleging that Defendants violated her constitutional rights during a

strip search. (*Id.* at 1, 7-8). Defendants are all Delaware Department of Correction (DDOC)

employees. (*Id.* at 1). The allegations arise out of an incident on February 7, 2018. (*Id.* at 2).

On that evening, correctional officers announced that a shakedown was taking place.

(*Id.*). Plaintiff and another inmate were instructed to leave their cell and go into the showers.

(*Id.*). While Plaintiff was in the showers, Sergeant Jones instructed her to "strip out" because he

was conducting a strip search. (*Id.* at 3). Plaintiff told Sergeant Jones that she is a transgender

woman and requested a female officer do the strip search, as she would be uncomfortable

undressing in front of a male officer. (*Id.*). Sergeant Jones advised Plaintiff that he would speak

with Lieutenant Travies about the issue.  (*Id.*).

About ten minutes later, Correctional Officer Arabia came to the showers and instructed

Plaintiff to comply with the strip search. (*Id.*). According to Plaintiff, he stated that if she did not

comply that she would be going to "the hole" or forced by male officers to strip. (*Id.*). Plaintiff

refused and stated that she would consent to the strip search if it was done by a female officer.

(*Id.*). Officer Arabia again told Plaintiff that she would have to strip or that she would "go to the

hole." (*Id.*). Plaintiff then consented to the strip search done by Officer Arabia. (*Id.*). Plaintiff

alleges that Officer Arabia conducted a visual inspection, laughed at her, and then walked away. (*Id.*).

Defendants dispute the circumstances of the search. (D.I. 75 at 14 of 28 n.2; D.I. 77 at 393 of 480). Correctional Officer Arabia filed an Incident Report that described Plaintiff "aggressively removing" her clothes, saying profanities to the correctional officers, and stating that she would be "calling PREA" to report the search. (D.I. 77 at 393 of 480).

During the incident, correctional officers found razors and what was alleged to be alcohol in Plaintiff's cell. (D.I. 77 at 354 of 480). Plaintiff pled guilty to possessing the contraband during a later disciplinary hearing. (D.I. 90 at 32-33 of 45).

Plaintiff spoke with Kelly Devinney, her therapist, on the day after the incident. (D.I. 77 at 428 of 480). After that meeting, Plaintiff called the Prison Rape Elimination Act (PREA) hotline and filed a complaint regarding the previous evening's incident. (D.I. 1 at 5). Ms. Devinney also notified a staff member in the medical department about Plaintiff's PREA complaint, and that staff member examined Plaintiff. (D.I. 77 at 348-49 of 480). Plaintiff reported that there was no inappropriate touching during the strip search, but that she felt like her character was sexually assaulted. (*Id.* at 348 of 480).

Defendants have filed a motion for summary judgment on five grounds. (D.I. 75). Defendants argue that summary judgment should be granted on Plaintiff's claims as: (1) Plaintiff failed to exhaust her administrative remedies; (2) there is no supervisory liability imposed under § 1983; (3) Defendants are protected by Eleventh Amendment immunity; (4) Defendants are protected by the doctrine of qualified immunity; and (5) the claims against Officer Arabia fail as his alleged actions do not rise to the level of a § 1983 violation. (*Id.*).

Plaintiff filed an opposition to Defendants' motion. (D.I. 86). Plaintiff contends that her claims are not barred as she exhausted administrative remedies and Eleventh Amendment immunity and qualified immunity are not applicable. (*Id.*). Further, Plaintiff asserts that her claims of supervisory liability and claims against Officer Arabia do not fail. (*Id.*).

## II.      LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 323.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." FED. R. CIV. P. 56(c)(1).

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 247–49. If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

## III. ANALYSIS

### A. Defendants are Entitled to Summary Judgment Due to Plaintiff's Failure to Exhaust Administrative Remedies.

The Prison Litigation Reform Act of 1995 (PLRA) prevents prisoners from filing suit with respect to prison conditions under Section 1983 "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Under the PLRA, prisoners must exhaust all available administrative remedies at the prison level before bringing suit. *See Woodford v. Ngo*, 548 U.S. 81, 85 (2006); *Williams v. Beard*, 482 F.3d 637, 639 (3d Cir. 2007). Exhaustion requires proper exhaustion, meaning that an inmate must "complete the administrative review process" in compliance with all applicable procedural rules prior to filing suit in federal court. *Woodford*, 548 U.S. at 88. In other words, inmates must avail themselves of "all steps the agency holds out" and do "so properly." *Id.* at 90 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002). The exhaustion requirement applies to all inmates seeking "redress for prison circumstances or occurrences." *Porter v. Nussle*, 534 U.S. 516, 520 (2002).

Whether a prisoner has properly exhausted a claim requires an evaluation of the "prisoner's compliance with the prison's administrative regulations governing inmate grievances,

and the waiver, if any, of such regulations by prison officials." *Spruill v. Gillis*, 372 F.3d 218, 222 (3d Cir. 2004). The "prison grievance procedures supply the yardstick for measuring procedural default." *Id.* at 231. Therefore, the inmate grievance procedures created by the Delaware Department of Correction, and in use at the JTVCC, measure whether Plaintiff's claims are procedurally defaulted. *See id.*

Defendants assert that Plaintiff did not comply with all available procedures and thus did not exhaust her administrative remedies. (D.I. 75 at 18-19 of 28). Plaintiff argues that she exhausted her remedies, as there was "nothing further [she] could do" after she was advised that her grievance was outside the purview of DDOC Policy 4.4 and had been handed to the PREA office for investigation. (D.I. 86 at 4). A determination of whether Plaintiff exhausted all administrative remedies available requires an analysis of Plaintiff's "compliance with the prison's administrative regulations governing inmate grievances." *Spruill*, 372 F.3d at 222.

To address most inmate grievances, inmates must follow the Delaware Department of Correction, Bureau of Prisons' detailed Inmate Grievance Policy: Policy 4.4. (D.I. 90 at 3-12 of 45). Under this policy, an inmate reporting a grievance must complete Form 584 and submit it to the Inmate Grievance Chairperson (IGC) within seven days of the incident. (*Id.* at 7 of 45). The grievance is then forwarded to the appropriate supervisor or staff member who has fourteen days to respond with the investigation outcome. (*Id.*). After that, the IGC will provide the grievant with a copy of the outcome. (*Id.*). Within seven days, the grievant must sign and return the form, and indicate whether the grievant accepts or rejects the outcome. (*Id.* at 8 of 45). If the grievant does not respond, the grievance is considered abandoned. (*Id.*).

If the grievant rejects the resolution, the grievance is brought before the Resident Grievance Committee (RGC) or the Subject Matter Expert (SME) Panel for a hearing, where the

grievant is present. (*Id.*). The RGC or SME Panel then submits a recommendation to the Warden regarding the outcome, and the Warden has fourteen days to decide whether to accept or reject the decision. (*Id.*). If the grievant is dissatisfied with the Warden's decision, then the grievant may appeal to the Bureau Grievance Officer (BGO). (*Id.* at 9 of 45). The BGO will make a recommendation to the Bureau Chief, whose decisions are final. (*Id.*). Exhaustion of the Policy 4.4 grievance system requires appeals to the Bureau Chief. (*See id.*).

Plaintiff filed three grievances using Form 584 in response to the February 7, 2018 incident. (D.I. 77 at 357-59 of 480).

Grievance number 393006, reported that officers took certain items, including coffee and creamer, from Plaintiff's cell. (*Id.* at 357 of 480). For action requested, Plaintiff wrote, "return my personal property." (*Id.*). An investigation ensued and it was determined that there was no proof that the property was taken. (D.I. 90 at 21 of 45). Grievance 393006 was appealed to the RGC, where it was denied on April 13, 2018, due to lack of proof. (*Id.* at 24 of 45). This grievance was appealed to the Warden, who denied it on April 16, 2018 for the same reason. (*Id.* at 25 of 45). It was not appealed to the BGO, thus stopping short of the final appeal in the grievance process. (*Id.* at 26 of 45).

Plaintiff filed Grievance number 392919 on February 7, 2018. (D.I. 77 at 358 of 480). In this grievance, Plaintiff described the shakedown, her sneakers, coffee, and creamer being taken, and that Officer Arabia was "very ignorant as well as disrespectful." (*Id.*). In this grievance, Plaintiff's requested action was "[i]nvestigate and return my personal property." (*Id.*). Plaintiff also filed Grievance number 392920 on February 7, 2018. (*Id.* at 359 of 480). This grievance had the same content as Grievance 392919 and requested the same relief. (*Id.*).

These grievances, 392919 and 392920, were returned to Plaintiff unprocessed. (D.I. 90 at 27-28 of 45; D.I. 77 at 360-61). In both instances, the Return of Unprocessed Grievance Form stated that the grievance was "outside the purview of 4.4." (D.I. 90 at 28 of 45; D.I. 77 at 361 of 480). It instructed Plaintiff that "staff issues should be corresponded to the Unit Manager, Capt. R. Dotson." In both instances, the form stated that Plaintiff should address her concerns regarding the search of her cell, as that resulted in disciplinary action, with the disciplinary hearing officer. (D.I. 90 at 27-28 of 45; D.I. 77 at 360-61 of 480). Plaintiff was also told to submit a request for her sneakers through the 4-12 shift. (D.I. 90 at 28 of 45; D.I. 77 at 361 of 480). As these concerns could not be addressed through the grievance process under Policy 4.4, Plaintiff was required to take other actions to address them.

As Grievances 392919 and 392920 were unprocessed, they did not proceed through the inmate grievance system. While Plaintiff pursued Grievance 393006, she did not exhaust her administrative remedies. She did not appeal the grievance beyond the Warden to the Bureau Chief. The Bureau Chief's review of a grievance is the last step in the Policy 4.4 procedure, but Plaintiff did not make an appeal to that level. Further, it should be noted that this grievance did not make any allegations regarding the officers' behavior during the strip search, and the only requested action was to return Plaintiff's personal property. (D.I. 77 at 357 of 480).

Plaintiff was informed that she had to pursue her complaints against Officer Arabia in another way. (D.I. 90 at 27-28 of 45; D.I. 77 at 360-61 of 480). Grievances against staff have their own procedural mechanism for review. (D.I. 90 at 5 of 45). Policy 4.4(3a) outlines the procedure for inmates to follow for a staff investigation. (*Id.*). An inmate is to "submit requests in writing to the area Supervisor/Unit Commander." (*Id.*). If the inmate receives no response or is unhappy with the response, the inmate can submit an appeal to the Security Superintendent, and

ultimately to the Warden. (*Id.* at 5 of 45). This policy is also outlined on the back of Form 584.

(*Id.* at 14 of 45). Plaintiff conceded that she knew that this was the process that needed to be

followed if there was an issue with staff. (D.I. 77 at 166 of 480).

Plaintiff, however, did not take any action to resolve her allegations against Officer

Arabia via the staff investigation process. Plaintiff was instructed to write to Captain Dotson

regarding the allegations concerning Officer Arabia, but Plaintiff confirmed that she did not do

so. (*Id.* at 168 of 480). Plaintiff's statement is consistent with prison records, as there is no record

of Plaintiff writing Captain Dotson in the Delaware Automated Correctional System (DACS).

(D.I. 90 at 43 of 45). Plaintiff also did not write Major Brennan (the security superintendent)

about the February 2018 incident involving Officer Arabia. (D.I. 77 at 168 of 480).

In this case, Plaintiff failed to take any of the required steps to pursue her allegations

against Officer Arabia stemming from the incident on February 7, 2018. As Plaintiff did not take

these required steps for administrative relief, she has not exhausted her administrative remedies

and her suit is barred under 42 U.S.C. § 1997e(a).

Plaintiff advances an argument that since her PREA complaint was handed to the PREA

office for investigation, there was "nothing further" that she could do. (D.I. 86 at 4 of 14).

However, Plaintiff did not exhaust her remedies regarding her PREA complaint.

After a PREA notification, the first step is a prompt and thorough investigation. (D.I. 77

at 368 of 480). After the investigation is concluded, with a decision of substantiated,

unsubstantiated, or unfounded, there must be a Critical Incident Review conducted within thirty

days. (*Id.* at 370 of 480). The Critical Incident Review report is then sent to the PREA

Coordinator and the Bureau Chief's office for review. *(Id.)*. The Bureau Chief has the final

review of the Critical Incident Review report. *(Id.)*.

Plaintiff filed a PREA report on February 7, 2018. (*Id.* at 339 of 480). The report states Plaintiff's claims that she was shook down and searched by Sergeant Jones and Correctional Officer Arabia. (*Id.*). The report further states that the inmate (Plaintiff) claims the search was not done in compliance with PREA and PREA standards. (*Id.*). The PREA notification was sent to Lieutenant Payson and an investigation ensued. (*Id.* at 339-44, 348-50 of 480). Lieutenant Payson interviewed Plaintiff. (*Id.* at 342-44 of 480). Plaintiff stated that she requested a female officer for the strip search and when Officer Arabia gave her a direct order to strip, she consented, and he conducted the search. (*Id.* at 342 of 480). Plaintiff confirmed that Lieutenant Payson asked her questions and gave her the opportunity to tell him about the February 2018 incident. (*Id.* at 171 of 480). There was also a PREA notification report from medical personnel who had been advised on Plaintiff's PREA complaint from Plaintiff's therapist. (*Id.* at 348-49 of 480).

Plaintiff's PREA investigation was closed on March 1, 2018. (*Id.* at 375 of 480). The incident was concluded to be unfounded, as Plaintiff was strip searched by a male officer, which aligned with the applicable policy (DDOC Policy 8.60). (*Id.*). On June 21, 2018, there was a Critical Incident Review of Plaintiff's PREA investigation. (*Id.* at 374 of 480). The finding of "unfounded" was reviewed and approved by the Warden on August 16, 2018, the PREA Coordinator on November 5, 2018, and the Bureau Chief on November 6, 2018. (*Id.*). Plaintiff was then informed of the investigation's conclusion that the PREA claim was unfounded. (*Id.* at 306 of 480).

Plaintiff did not exhaust her administrative remedies for her PREA complaint. Plaintiff filed suit on May 16, 2018. (D.I. 1). The Critical Incident Review and the review and approval of the findings by the Warden, the PREA Coordinator, and the Bureau Chief, all occurred after

Plaintiff filed her lawsuit. (D.I. 77 at 374 of 480). Plaintiff did not wait for the outcome of her PREA complaint before bringing suit in federal court. Therefore, she did not fully exhaust her administrative remedies regarding her PREA complaint, as required by Section 1997e(a), prior to filing her complaint in federal court. *See Woodford*, 548 U.S. at 90 (determining that the PLRA requires an inmate to "properly" avail herself of "all steps" in the administrative review process); *Turner v. Sec'y Pa. Dept' of Corrs.*, 683 F. App'x 180, 182 n.1 (3d Cir. 2017) ("An inmate cannot cure non-compliance with § 1997e(a) by exhausting remedies after filing his complaint.") (citing *Ahmed v. Dragovich*, 297 F.3d 201, 209 (3d Cir. 2002)); *Scott v. CO Smoke*, 2019 WL 7163465, at *3 (M.D. Pa. Dec. 19, 2019) (holding that an inmate failed to exhaust administrative remedies when he filed suit in federal court while his PREA complaint remained under investigation).  As such, her suit is barred.

As Plaintiff did not fully exhaust her administrative remedies for either her staff grievances or her PREA complaint, her suit is barred under 42 U.S.C. § 1997e(a). Defendants are therefore entitled to summary judgment as a matter of law.

### B.  Plaintiff's Claims are Barred by the Doctrine of Qualified Immunity

In support of their motion for summary judgment, Defendants also argue that they are entitled to qualified immunity, and thus that Plaintiff's claims are barred. (D.I. 75 at 16-19). Defendants assert that there is not a clearly established right that transgender (male to female) inmates "who are biologically male and retain their male external anatomical features below the waist shall only be searched by female officers in all situations." (*Id.* at 19). Plaintiff contends that Defendants do not have qualified immunity as they knew that she was a transgender woman and proceeded to conduct the search with deliberate indifference. (D.I. 86 at 9 of 14).

Government officials are protected from liability for civil damages where their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). To overcome a government official's claim of qualified immunity, a plaintiff must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011); *see also Anderson v. Creighton*, 483 U.S. 635, 639 (1987). Trial courts have discretion to determine which of the two prongs to resolve first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). A government official is entitled to summary judgment where "in light of the clearly established principles governing" the challenged act, the officer could, "as a matter of law, reasonably have believed" that his actions were lawful. *Anderson*, 483 U.S. at 641.

In other words, qualified immunity protects government officials so long as the official reasonably would not have known that the action would violate the plaintiff's constitutional rights. *Harlow*, 457 U.S. at 818. Whether an official shielded by qualified immunity "may be held personally liable for an allegedly unlawful action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson*, 483 U.S. at 639.

 Where the statutory or constitutional right that the government official is alleged to have violated is not clearly established, qualified immunity will protect the official's actions. *See Ashcroft*, 563 U.S. at 735; *Harlow*, 457 U.S. at 818. If the law at the time is not clearly established, a government official could not reasonably know that the law prohibited the conduct "not previously identified as unlawful." *Harlow*, 457 U.S. at 818. A right is clearly established where the "contours of the right" are clear enough that "a reasonable official would understand

that what he is doing violates that right." *Anderson*, 483 U.S. at 640. In the "light of the pre-existing law," the unlawful nature of the act "must be apparent." *Anderson*, 483 U.S. at 640; *see also Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017).  A clearly established right "does not require a case directly on point," but the "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741.  There must be "sufficient precedent at the time of the incident," that is factually similar to plaintiff's claims, "to put the defendant on notice that his or her conduct is constitutionally prohibited." *Mammaro v. New Jersey Div. of Child Prot. & Permanency*, 814 F.3d 164, 169 (3d. Cir 2016) (quoting *McLaughlin v. Watson*, 271 F.3d 566, 572 (3d Cir. 2001)).

In this case, there is no clearly established right for a transgender inmate to be strip searched by an officer of the gender with which the inmate identifies. As Defendants noted (D.I. 75 at 19), and Plaintiff concedes (D.I. 86 at 9), there is no precedent to support the existence of this right. A nationwide review of caselaw shows that no court, prior to February 7, 2018, or since, has found that there is a constitutional right for a transgender inmate to have a strip search performed by an officer of the gender with which the inmate identifies. *See Carter-el v. Boyer*, 2020 WL 939289, at *4 (E.D. Va. Feb. 25, 2020) ("[L]ittle, if any, case law addresses the issue of propriety of cross-gender searches of transgender inmates."). There is no "sufficient precedent" that would have put Defendants "on notice" that their actions were "constitutionally prohibited." *See Mammaro*, 814 F.3d at 169.

While it is true that there does not need to be a case directly on point for a right to be clearly established, there still must be existing precedent to put the constitutional question "beyond debate." *Ashcroft*, 563 U.S. at 741. Regarding the constitutional right that Plaintiff raises, the right for transgender inmates to be searched by a staff member of the gender with

13

which the inmate identifies, the lack of case law and precedent show that this is not a clearly established right. Thus, Defendants are entitled to qualified immunity, as there was no clearly established right that the Defendants reasonably should have known that they were violating when they ordered and performed Plaintiff's strip search on February 7, 2018.

Further, "in light of the clearly established principles governing" strip searches, Defendants would have reasonably believed that their actions were lawful. *See Anderson*, 483 U.S. at 641. The Delaware Department of Correction's Policy 8.60(VI)(A)(7) provides that cross gender strip searches are not to be conducted, except in the case of exigent circumstances. (D.I. 77 at 365 of 480). This applies to transgender inmates as well, as DDOC Policy 8.60A provides that strip searches of transgender inmates will be done by a staff member of the same biological sex as the offender, except under exigent circumstances. (*Id.* at 470 of 480). Defendants were complying with Department of Correction policies in having male correctional officers perform Plaintiff's strip search. As the procedure of Plaintiff's strip search complied with the relevant policies, Defendants would not have reasonably believed that their actions were unlawful.

Since there was in 2018 no clearly established constitutional right for transgender inmates to be searched by staff members of the same gender with which the inmate identifies, Defendants are entitled to the protection of qualified immunity as matter of law. Plaintiff's claims are barred, and Defendants are entitled to summary judgment.

## IV.    CONCLUSION

Defendants are entitled to summary judgment on Plaintiffs' claims against them, as the claims are barred by Plaintiff's failure to avail herself of all administrative remedies prior to filing suit. In addition, Defendants are entitled to summary judgment as their actions are protected by qualified immunity. As either of these grounds is sufficient to resolve Defendants'

motion, the Court need not, and does not, reach the other grounds on which Defendants requested summary judgment.